THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 15-206-RAJ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S SENTENCING MEMORANDUM |
| | ) | |
| AMANDA CARGILE, | ) | |
| Defendant. | ) | |
| | ) | |

## I.    Sentencing recommendation

A sentencing hearing is scheduled for Friday, September 29, 2017, at 2:30 p.m. because Amanda Cargile voluntarily terminated from the DREAM program. As noted in the hearing and in her letter to the Court, while Ms. Cargile does not want a felony conviction, she was more inclined to terminate from DREAM because termination from DREAM meant that she would be subject to a longer period of federal supervision. *See, e.g.,* Letter by Cargile at pp. 22-26. Ms. Cargile was introduced to alcohol when she was only six years old and intoxicated at age 10 years. As described in her DREAM application materials, her formative years were fraught with drugs, alcohol, chaos and neglect and/or abuse. Not surprisingly, from age 19 years old, she endured an abusive romantic partner and increasingly struggled with addiction. By the time she entered DREAM in October 2015, Ms. Cargile had consumed most particularly addictive types of controlled substances, including methamphetamine and heroine, and had been struggling with

an opiates addiction for the past (approximately) eight years. Despite that background, Ms. Cargile saw the federal prosecution as an opportunity to get help, and made progress during pretrial supervision, and then some progress in DREAM, but her road forward – particularly given her break up from her long-time abusive partner, and the resulting loss of the children, and housing, coupled with long-standing depression and trust issues – was much harder than anticipated.  New to recovery, she admittedly made poor decisions along the way that thwarted her hopes of moving forward in her recovery, for which she only holds herself responsible. *Id.* Thus, Ms. Cargile views a longer term of supervision than that contemplated by the DREAM program the opportunity for continued accountability while working on her trust issues and problem solving skills with the support of the Probation Department, as well as receiving necessary chemical dependence treatment and mental health counseling she so desperately desires to truly succeed. *Id.*

The Court accepted her voluntary termination, and now, per the terms of the DREAM contract and Interagency Agreement, Ms. Cargile is to be sentenced based on the guilty plea previously entered pursuant to the written plea agreement, taking into consideration any failures while in DREAM, as well as her successes:

> Prior to sentencing, the DREAM Judicial Officer may order the production of a Presentence Report.  And at sentencing, the DREAM Judicial Officer may consider in imposing a sentence otherwise consistent with the terms of the written plea agreement, all conduct that has taken place during your participation in the DREAM program, including any failures, sanctions imposed and successes achieved.

Dkt. 25, p. 10 (DREAM Contract). Moreover, "in making a recommendation, the parties should not recommend a longer sentence than what would have been imposed if the standard plea was taken simply as a means to 'set an example' for other drug court participants." Interagency Agreement, pp. 17-18.

Here, the terms of the plea agreement anticipate a sentencing recommendation of no more than 18 months imprisonment by the Government, with the defense free to make any

DEFENDANT'S SENTENCING MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

recommendation it deems reasonable. Dkt. 21, p. 7. Consistent with that agreement, as well as the fact that Ms. Cargile has endured sanctions over the course of nearly two years in DREAM, has in fact, made "genuine attempts to succeed" in the program despite her ultimate voluntary termination, and, inter alia, the collateral consequences of imprisonment on her innocent children, the defense recommends a sentence of 90 days imprisonment coupled with up to 90 days of Location Monitoring and the three year term of supervision otherwise recommended by the Probation Department.[1]

## II.    Discussion

### A.    Three months imprisonment coupled with another three years of federal supervision that includes a reasonable term of location monitoring reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

On December 24, 2014, Ms. Cargile began working as a licensed practical nurse at Lynden Manor, an assisted living facility in Lynden, Washington. Two months later, on February 26, 2014, another employee conducted a drug count on a medication cart and noticed a discrepancy in how the hydrocodone pills looked. The pharmacist identified the pill as a Tylenol and over the course of the day and the next morning, it was determined that the medication for a total of six residents had been tampered with in the same fashion. All employees were tested and Ms. Cargile tested positive for hydromorphone, oxazepam, temazepam and morphine.[2] She was not allowed to return to work and her employment was eventually terminated. It was later determined that approximately 165 tablets had been taken.[3]

---

[1] The Probation Department recommends six special conditions, the first four of which relate to her need for mental health and substance abuse treatment, and the remaining two conditions in regards to the collection of the $722.68 restitution owing.  The defense therefore has no objections to the proposed special conditions.

[2] *See, e.g.,* Dkt. 1, p. 7 (Complaint).

[3] *See, e.g.,* Dkt. 21, ¶ 7(c) (Plea Agreement).

DEFENDANT'S SENTENCING MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The nature and seriousness of Ms. Cargile's offense is not disputed. As she noted in her application to DREAM, there is no excuse for the decisions she made. Accordingly, she cooperated with the investigation when confronted in April 2014 by investigators from the Washington Nursing Care Quality Assurance Commission, provided a written statement acknowledging responsibility and thereafter plead guilty shortly after the federal proceedings were initiated in May 2015.[4] These facts regarding her remorse and acceptance of responsibility should mitigate against any notions that greater incarceration than that proposed by the defense is necessary to achieve just punishment.

The Court's "retribution" analysis should also be informed by "the nature and seriousness of the harm caused or threatened by the crime." [5] Here, although the defense acknowledges the *risk* of harm in these types of cases, importantly no one was in fact, harmed by Ms. Cargile's conduct.[6] In fact, no patients reported complaints of pain and there is no other evidence that any of the patients experienced harm or increased pain due to Ms. Cargile's conduct.

Finally, any perceived need for further retribution based on the nature and circumstances of the offense should also be lessened by the fact that, (1) the court must impose the minimum sentence necessary to comply with the goals of sentencing, (2) the role her then-untreated

---

[4]  Ms. Cargile plead guilty to one count of Tampering with Consumer Products on September 23, 2015. Dkt. 21 (Plea Agreement). The Complaint was filed in May, 2015. Dkt. 1.

[5]  Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: Proportionality, Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005) (courts typically look to two kinds of elements in assessing § 3553(a)(2)(A) factors, i.e., "the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.")

[6]  If "serious bodily injury to any individual results," the statutory maximum is twenty years, a fine, or both. 18 U.S.C. § 1365(a)(3). "Serious bodily injury" includes "extreme physical pain." *Id*. In cases where there is only a risk of "bodily injury" or death but no resulting "serious bodily injury," the statutory maximum is ten years, a fine, or both. 18 U.S.C. § 1365(a)(4). Ms. Cargile's case was charged and resolved under the 10-year risk of harm provision, not the 20-year charge which requires proof of actual "serious bodily injury." Dkt. 21, ¶ 3.

---

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

substances abuse issues and untreated mental health issues played in her decision making, (3) her post-offense rehabilitation efforts not only in the DREAM program, but also on pretrial supervision before her admission to DREAM, and (4) the direct and collateral consequences of these proceedings.[7]

> **(1) Three months incarceration coupled with a reasonable term of Location Monitoring and federal supervision is the minimum term necessary to achieve legitimate goals of sentencing.**

The overarching instruction of 18 U.S.C. § 3553(a) is to impose the minimum term necessary to achieve legitimate goals of sentencing.[8] Imprisonment for another year – at a cost of (approximately) $32,000 to taxpayers[9] – is not the minimum term necessary to achieve retribution for Ms. Cargile's 2014 offense conduct.

Although at first blush the Government's recommendation seems fair in light of Ms. Cargile's exposure under the advisory guidelines, the advisory guidelines are not only excessive as essentially conceded by the Government, but also not worthy of any legitimate weight in the sentencing decision.[10] If not so considered, the calculation as a starting point, rather than promote respect for the law, has the opposite effect to promote "derision[] of the law if the law is viewed

---

[7] Frase, *supra.* n. 5, *Excessive Prison Sentences . . . .,* 89 Minn. L. Rev. at 590; *see also Williams v. New York*, 337 U.S. 241,247 (1949); *United States v. Lopez-Gonzales*, 688 F.2d 1275, 1276-77 (9th Cir. 1982).

[8] *United States v. Booker*, 543 U.S. 220, 264 (2005); *see also* 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (minimum term requirement is often referred to as the overarching instruction of § 3553(a)).

[9] Probation Sentencing Guidelines Calculation, ¶ 34.

[10] *Spears v. United States*, 555 U.S. 261 (2009) (district court can categorically reject the disparity caused by the crack-to-powder ratio and instead apply a different ratio which, in its judgment, corrects the disparity). *See also United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *see also United States v. Carty*, 520 F.3d 984, 990-992 (9th Cir. 2008) (en banc) (same under § 3553(a) objectives) (quoting *Rita v. United States*, 551 U.S. 338 (2007)); *United States v. Kimbrough*, 552 U.S. 85, 109 (2007) (the advisory guidelines are only a "rough approximation of sentences that *might* achieve § 3553(a) objectives") (quoting *Rita*, 551 U.S. at 350) (emphasis added)).

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

merely as a means to dispense harsh punishment without taking into account the real conduct and circumstances at sentencing."[11]

First, the advisory guidelines fail to "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Tampering is not a crime of violence.[12] And although Ms. Cargile has prior offenses, all are relatively minor non-violent offenses for which she has spent less than a month in jail and directly related to her longstanding addiction, poverty and mental health. The defense recommendation of some incarceration followed by location monitoring in lieu of continued incarceration, is in keeping with these facts and statutory directives.

Second, the advisory guidelines fail to take into account any mitigating facts, most importantly, Ms. Cargile's formative years and the impact of her longstanding disease of addiction and mental health that contributed to her choices in 2014 and mistakes made over the course of her participation in DREAM,[13] thereby ignoring the longstanding indispensable elements of just sentencing, i.e., reasoned judgment and individualized tailoring.[14] In 1949, the Supreme Court made clear that, "[p]unishment should fit the offender not merely the crime. The belief no longer prevails that every offense in a like category calls for an identical punishment

---

[11]  *Gall v. United States*, 552 U.S. 38, 53-54 (2007) (quoting district court opinion).
[12]  *Accord Begay v. United States*, 553 U.S. 137, 146-47 (2008) (noting that Tampering with Consumer Products would not be a crime of violence).
[13]  *Accord Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (evidence about a person's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse.")
[14]  *Mistretta v. United States*, 488 U.S. 361, 390 (1989) ("for more than a century, federal judges have enjoyed wide discretion to determine the appropriate sentence in individual cases and have exercised special authority to determine the sentencing factors to be applied in any given case.")

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

without regard to the past life and habits of a particular offender."[15] This principle of justice remains true today, despite the existence of the guidelines.[16] Accordingly, a district court must not determine the appropriate sentence in an individual case by the mechanistic application of a given sentence to a given category of crime; rather the sentencing court has the duty to ensure the sentence imposed is tailored to the individual before it.

Third, the base offense level of 25 was meant to address conduct far more egregious than that present in this case that, also unlike this case, had a clear effect on interstate and foreign commerce. Specifically, 18 U.S.C. § 1365(a) was enacted after an unidentified perpetrator in 1982 laced a nationally known pain killer with cyanide, killing seven people in the Chicago area.[17] These tragic deaths were followed by a nationwide spate of copycat poisonings of over-the-counter drugs and food products, and by the insertion of other foreign, and equally deadly, objects into those products. In addition, there was an increase in false claims that consumer products had been tampered with, causing recall of products. All of these incidents had a marked effect on consumer confidence, not only in those products specifically affected, but also in all consumer products sold on open shelves. Congress accordingly, "acted quickly to impose federal sanctions on such conduct."[18] Then-President Ronald Reagan initially vetoed the Bill for a number of reasons but a year later, Congress again took the task of enacting the legislation "so urgently needed to counteract the wave of tamperings [sic] sweeping the country, and to restore confidence in consumer products."[19]

---

[15] *Williams v. New York*, 337 U.S. 241, 247 (1949).
[16] *See, e.g., Gall v. United States*, 622 U.S. 38 (2007); *United States v. Lopez-Gonzales*, 688 F.2d 1275, 1276-77 (9th Cir. 1982) (same); *see also* 18 U.S.C. § 3661 (making clear importance of information regarding defendant's background, character and conduct in sentencing determination).
[17] *See* H.R. Rep. No. 93, 98th Cong., 1st Sess. 3 (1983) ("House Report"), reprinted in 1983 U.S.C.A.A.N. 1257.
[18] *Id*. at 1258.
[19] *Id*.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Concerns were raised about increasing federal reach into local criminal matters. In response, the House Report noted that all of the witnesses testifying in favor of the legislation recognized that federal jurisdiction over criminal conduct is necessarily limited by the Constitution, but cited the "national effect on consumer confidence as a basis for federal concern." As an example, the House Report noted "a tampering incident on the West Coast can cause consumers on the East Coast to be afraid to buy the affected product."[20]

Congress also voiced concerns about the difficulty in ascertaining where along the distribution line the tampering occurred. In response to that stated concern, the House Report noted that a "disgruntled employee in a factory in Wisconsin may tamper with a product there, but until the product is sold in California, its effects may be undiscovered. Such tamperings [sic] have a clear effect on interstate and foreign commerce, and federal intervention is appropriate."[21]

In addition to specific examples, the House Report states explicitly that federal jurisdiction should not extend to all tamperings. "[B]ecause the possible penalty is so severe," "liability should be limited to those circumstances where the defendant consciously disregards a grave risk of serious danger to other persons."[22] Although Ms. Cargile acted with reckless disregard for the risk that another person would be in danger, as that element is defined by statute,[23] the example most frequently cited in the House Report is that of "a disgruntled employee who sought revenge against the corporate manufacturer of a drug, but who convincingly denied to a jury an intent to harm anyone by his or her conduct, would have escaped

---

[20] *Id*. at 1258-59.
[21] *Id*. at 1259.
[22] *Id*.
[23] Dkt. 21, ¶¶ 2, 7(a) & (e).

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

conviction for lacing such drugs with cyanide."[24] That example again highlights Congress's intent to reach only those acts that have a clear national consequence.

The federal concerns targeted by Congress in enacting § 1365(a) are not present in Ms. Cargile's case or in fact, in other cases (to counsel's knowledge) involving health professionals who dilute medication involving their patients. The impact of these crimes are inherently local rather than national in scope. Indeed, the United States Attorneys' Manual recognizes that referral to state and local authorities "is appropriate when [as in Ms. Cargile's case] no significant Federal interest requires vindication (e.g., in an isolated instance, when there is no serious impact upon commerce, when the wrongdoer has been identified and state or local authorities are prepared to handle the case, etc.)."[25]

It is true that the Government does not have to follow the narrow intent set forth in the Congressional record where Congress has drafted a statute more broadly, and it does not even have to follow recommendations in the United States Attorneys' Manual. However, the above facts are nevertheless important in considering how much weight should be given to the Sentencing Guidelines, where those guidelines were designed with conduct at the heart of the congressional record and far more egregious than that present in the case before this Court.

The fact the advisory guidelines should carry little, if any, weight in the Court's analysis, is further demonstrated by looking to other guidelines involving reckless or criminally negligent acts which actually result in death or serious bodily harm. For example, the crime of involuntary manslaughter would only carry a base-offense level of 12 if the offense involved criminal negligence, or 18 if the conduct was reckless, in contrast to a base offense level of 25 at issue

---

[24] House Report, *supra*. n. 17, at 1260
[25] U.S. Attorneys' Manual 9-63.1110, 1999 WL 3321995 (U.S.A.M.)

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

here.[26] Similarly, even an aggravated assault involving bodily injury would start out at a base offense level of 14 with an additional 3-levels for bodily injury.[27] Put differently, the advisory guidelines at issue in this case, are grossly inflated, were not developed based on empirical evidence and, are devoid of individual tailoring. Accordingly, any suggestion that the advisory guidelines warrant any weight as a legitimate "starting point," only serves to yield unjust results.[28]

That conclusion seems evident by the fact that in this district, the few cases involving health professionals like Ms. Cargile charged under the product tampering statute resulted in sentences far below the advisory guideline range.[29] The Probation Department does not seem to disagree but nevertheless, in its recommendation, the Probation Department utilizes these cases as a means to support its recommendation for 18 months of imprisonment, noting "Ms. Cargile has a sentencing guideline range higher than all of the similar cases."[30]

Those cases, along with one additional similar cases, i.e., *Long*, are outlined in the table below:

/ / /

/ / /

/ / /

/ / /

---

[26] *See* U.S.S.G. § 2A1.4(a).

[27] *Id.* at § 2A2.2.

[28]    Judges "may vary [from guideline ranges] based solely on policy considerations, including disagreements with the guidelines," *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (internal quotation marks omitted), and when they do, the courts of appeal may not grant greater fact finding leeway to the commission then to the district judge. *Rita v. United States*, 551 U.S. 338, 347, 351, 356 (2007).

[29]  *See* Probation Sent. Rec., pp. 4-6.

[30]  *Id.* Ms. Cargile's advisory range is 78 to 97 months based on offense level 29 and criminal history III. *See id..*, p. 1.

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

| Case | Government Rec. & Range | Sentence Imposed | Facts related to scope/severity of harm from tampering taken from Government Sentence Memo |
|------|------------------------|------------------|-------------------------------------------------------------------------------------------|
| Ahrens, 14-331RSM | 6 months (63-78 months) | 90 days | Medic One paramedic who tampered with nine vials of morphine by replacing morphine with etomidate or Benadryl in truck. Etomidate is sedative that will cause a patient to become unconscious for short period and then wake in pain. It could also result in severely allergic reaction or serious bacterial or viral infection. Erratic behavior seen when on shift. Per government, impacted not only Medic One but also how the public views paramedics and other medical professionals. |
| Allen, 10-5363RBL | 51 months (51-63 months) | 27 months | Steeling/tampering with drugs from Fire Department for three years; stole all of the fentanyl from the Fire Department; large scale theft of several types of drugs. |
| Gibson, 09-148RSM | 30 months | 12 months, 1 day | Defendant had a prior licensing sanction for prescription fraud. Defendant diluted Demerol at a plastic surgery center. There was evidence that multiple patients were administered diluted drugs and suffered untreated pain as a result. |
| Huffman, 13-369JCC | 15 months (63-78 months) | 6 months, with restitution ($10,690) | Defendant at two plastic surgery clinics At one, she tampered with hydromorphone vials and replaced with saline solution. Risk that patients could be administered vials that contained saline with no pain killing effects. Previously, at the other clinic, she fraudulently obtained narcotics prescriptions by stealing her employer's prescription pads and forged prescriptions. |
| Larsen, 10-333JLR | 20 months (63 to 78 months) | 12 months, 1 day | Defendant worked in a nursing home center with "highly vulnerable patients." Over six-month period, defendant diluted morphine. At least one patient received diluted morphine and experienced unnecessary pain. |

DEFENDANT'S SENTENCING MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

| Case | Government Rec. & Range | Sentence Imposed | Facts related to scope/severity of harm from tampering taken from Government Sentence Memo |
|------|------------------------|------------------|------------------------------------------------------------------------------------------|
| Linvog, 12-275RAJ | 30 months<br><br>(87 to 108 months) | 12 months, 1 day | "Appalling" and "Egregious." Defendant worked at long-term care facility for elderly, end of life hospice care where she replaced pain drugs with tap water. This case is unique because there are identifiable victims of actual harm. Defendant had past prescription forgery conviction which she had vacated after the tampering was discovered in the current case. Victims were particularly vulnerable and some were non-verbal and unable to articulate unmanaged pain. There were also questions about defendant's acceptance of responsibility. |
| Long, 12-5390BHS | 18 months, per plea | 6 months | Diluted vials of morphine and dilaudid were actually administered to patients over 4-month period in a hospital setting. Defendant admitted that patients were given diluted pain medications and suffered from untreated pain. |

First, Ms. Cargile's range is overstated by criminal history category III but more importantly, as discussed above, the guidelines are neither just nor indicative of reason and therefore, should carry little or no weight in an assessing disparities with similarly situated individuals. Second, the Probation Department distinguishes this case from *Allen*; rightly so given the conduct spanned at least three years and involved large scale theft. And yet, it suggests that Ms. Cargile warrants a sentence greater than those who received six months or 90 days, suggesting the offense conduct was more egregious. In making that argument, the Probation Department ignores the fact that as in *Huffman* and *Ahrens*, but unlike all other cases, no patients in this case were known to have received the tampered medications or suffered any pain. For that most compelling reason, *Huffman* – even though the restitution owed is far greater than in this case – and *Ahrens* are the most similar of cases to the offense before this Court.

In sum, with the watershed decision of *Booker*, 543 U.S. 220, and the subsequent Supreme Court decisions in *Rita*, 551 U.S. 338, *Gall*, 552 U.S. 38, and *Kimbrough*, 552 U.S. 85, the question of *whether* prison is even necessary for a particular individual returns to a place of

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 12

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

primacy in the sentencing decision. Here, although the guidelines suggest imprisonment is warranted, neither the cases cited – all of which are unique in their own right – nor the guidelines, -- which are grossly inflated, were not developed based on empirical evidence and continue to yield unjust results -- merit a sentence greater than that urged by the defense.

### (2) The need for any further retribution than that recommended by the defense is mitigated by Ms. Cargile's substance abuse and mental health

Ms. Cargile has had what can only be described as a terrible life. As described in her DREAM application, Ms. Cargile was raised in a home filled with drugs, alcohol, chaos and verbal abuse. Her formative years no doubt negatively impacted her maturation and/or the normal development of her brain.[31] Substance abuse, beginning with alcohol at a very young age, and ultimately escalating to years of opiates abuse, no doubt thwarted her maturation and mental well-being as well.

When she was 19 years old, she met Curt Sleasman. Although Ms. Cargile was able to overcome tremendous obstacles to go to school and become a nurse, sadly, she entered a relationship that mirrored her childhood. They were together 11 years, until March 2015, and had two young children together; their first child was stillborn. Their other children are now seven and nine years old.  By all accounts, Mr. Sleasman is a severe alcoholic who was physically and mentally abusive to Ms. Cargile over the many years, and to some extent, to this day. Ms. Cargile dealt with the abuse and unhealthy relationship by using drugs. Her opiate addiction began in March 2007, with prescriptions for Percocet and Vicodin. As summarized in the

---

[31] *See, e.g.,* J. Douglas Bremner, M.D., *Traumatic Stress: Effects on the Brain* (2006); *see also* Debra Niehoff, *Ties that Bind: Family Relationships, Biology and the* Law, 56 DePaul L. Rev. 847, 849, 855, 861 (2007) (child abuse and neglect can cause chemical changes in the brain and nervous system; abuse "need not involve actual physical injury to do lasting damage to the developing brain"). *See also e.g.,* Rosenberg, J., & Wilcox, W. Bradford, *The Importance of Fathers in the Healthy Development of Children*, U.S. Dept. of Health and Human Services (2006) (parents have a direct impact on the well-being of their children from their early childhood through adolescence and adulthood; an involved nurturing and caring father, for instance, can directly impact the child's academic achievement, verbal skills, intellectual functioning, as well as the child's physical and emotional health, and thereby, help the child avoid drugs, violence and delinquent behavior).

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 13

DREAM application, over the next eight years, Ms. Cargile used Percocet, Vicodin, Oxycontin, morphine, Dilaudid, Fentanyl (once or twice), heroin (twice), and methamphetamine.

It is against this background that without any previous treatment or decent role model to change the course of her formative years, she made the choice to engage in the offense conduct. While not an excuse for the offense conduct or choices made, the mitigating facts about her formative years should inform the sentencing decision.[32]

These mitigating facts about her formative years should also inform the Court's assessment of her time in DREAM. At the time of her application in September 2015, Ms. Cargile had been on pretrial supervision for approximately five months. During that time, she worked at a manufacturing job in Bellingham, began treatment and was honest about the stress of living at home with Mr. Sleasman, whom she had separated from but he refused to leave their home. As reflected in her DREAM application materials, she felt alone with little outside support and financially dependent on Mr. Sleasman but nevertheless, with the support of the Probation Department, hoped to save money and find a new home for herself and the children.

She entered DREAM in late October, 2015.[33] Thereafter, Mr. Sleasman's abusive behavior continued and ultimately, he not only kicked her out of the home, but also utilized her disease of addiction to obtain full custody of the children. She was suddenly homeless, without her children, and without hope. Thus, while the Probation Department and the DREAM Executive Team repeatedly tried to help her find housing, stability, and sobriety and ultimately, with the gracious and effective help of pro bono counsel she reunited with her children with hopes of someday sharing joint custody,[34] "skills" learned in her formative and later years with Mr. Sleasman no doubt impacted her ability to trust and appreciate the opportunity of DREAM, particularly when there were gaps in mental health counseling. Again, these are not excuses for Ms. Cargile's choices, but they should inform the Court's decision and mitigate against any

---

[32] *See Penry v. Lynaugh, supra.*, n. 13, 492 U.S. at 319.
[33] Dkt. 25.
[34] *See* Letter by Attorney Michelle Peterson at p. 28.

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 14

notion that her struggles and choices are a moral failing as opposed to indicative of a disease that warrants long-term mental health and substance abuse counseling.

### (3) The need for any further retribution than that recommended by the defense is mitigated by Ms. Cargile's post offense rehabilitation

Post-offense rehabilitation is an appropriate sentencing consideration that weighs in favor of mitigation. *Pepper v. United States*, 131 S. Ct. 1229 (2011). Even prior to *Booker*, numerous courts made substantial departures based on post-offense rehabilitation, resulting in non-custodial sentences.[35]    True, Ms. Cargile ultimately did not succeed in DREAM. Nevertheless, that fact is indicative of her place in recovery and not an unwillingness or inability to succeed.  Ms. Cargile is not proud of her mistakes. She is most proud of her successes while in DREAM that include, successful participation in two inpatient treatment programs, i.e., CORP (July 2016 through September 2016) and PCN (December 2016 through January 2017), continued participation in outpatient treatment, participation in mental health treatment, securing housing that apparently meets all the requirements of the parenting plan to visit and take care of her two young children, and working diligently with counsel to secure her visitation rights with the children with hopes of ultimately enjoying joint custody. In addition, although she lost her job following her arrest, as set forth in her employer's letter, she is welcome back should a position be available when she releases from custody.[36] These steps should not be overlooked particularly when viewed in light of her background and life experiences.

Most importantly, when she relapsed on the anniversary of her first child's death and was arrested, she utilized her time in custody to reflect upon her choices, including any dishonesty

---

[35] *See e.g. U.S. v. Jones*, 158 F.3d 492 (10th Cir. 1998) (firearm conviction where court departed downward by three levels to probation when, as one of several factors, it considered that the defendant had adhered to the conditions of his release and changed both his attitude and conduct during his release constituting post-offense rehabilitation); *U.S. v. Parella*, 273 F. Supp. 2d 161 (D. Mass. 2003) (defendant convicted of three bank robberies and court departed from 30-37 months to probation based, in part, on post-offense rehabilitation); *U.S. v. Blake*, 89 F. Supp. 2d 328 (E.D.N.Y. 2000) (in bank robbery case, departure from level 29 to probation granted, in part, because incarcerating defendant would "reverse the progress she has made" and considering the decreasing opportunities for rehabilitation in federal prisons resulting from ever-increasing prison populations).
[36] *See* Letter by Cory Bowling at p. 27.

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    with the Probation Department. Based on that reflection, she chose to voluntarily terminate from

2    the DREAM program – even though that meant a felony conviction, potential incarceration and

3    with incarceration, no contact with her children. That decision took humility, bravery, and

4    resolve to finally surrender to the fact that she requires more help and accountability if she truly

5    wishes to succeed. As reflected in her letter to the Court, there should be no doubt that her intent

6    is sincere.  She just needs help. In short, despite the termination, she has indeed made steps

7    forward in her recovery and any steps should be built upon, not thwarted by unnecessary

8    incarceration.

9                    **(4) Collateral consequences**

10           The Court has a wide panoply of sentences it can impose. Anything from probation to

11   imprisonment, including alternatives to imprisonment such as time spent in a community

12   corrections center, or on home detention. It can also impose a number of additional conditions

13   such as a requirement that Ms. Cargile perform community service. It could also impose

14   restrictions on her movement via the Location Monitoring program, as is suggested by the

15   defense. In considering the kinds of sentences that are available to the Court, the Court should

16   consider the kinds and type of punishment that Ms. Cargile has already endured and those that

17   will now flow from the convictions.

18           With respect to penalties already endured, while the Government notes her mistakes over

19   the course of the DREAM program, it fails to appreciate the fact that in each instance, Ms.

20   Cargile's mistakes were sanctioned in some way. For example, she was required to travel from

21   Bellingham area to Seattle or Tacoma to witness two sentencing hearings and report to the

22   participants and Executive Team. She was also repeatedly reprimanded and incarcerated.

23   Moreover, she was penalized by the local entities related to any new or old offenses. Further, she

24   has also served approximately two years of intensive supervision. The Supreme Court in *Gall*

25   recognized the substantial restriction of liberty involved in even standard conditions of

26

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

probation,[37] and yet none of the two years served on pretrial supervision before and during DREAM will reduce the term of supervision ultimately imposed.

In terms of prospective collateral consequences of her decision, most significant of the consequences is the impact of her imprisonment on her innocent children. Incarcerated, her young children have essentially no contact with Ms. Cargile and instead are left with an abusive, alcoholic father who, by all accounts, has no real interest in being the primary parent.

In addition, following her sentencing in this case, the Washington Department of Health will likely revoke or suspend her license,[38] if it hasn't already done so. Even if she is able to later petition to renew her license, her ability to find employment either in the field or outside her training is severely limited. In fact, federal law excludes individuals from "participation in any federal healthcare program," if they have been convicted of program-related crimes, convictions relating to patient abuse or felony convictions relating to controlled substances.[39] Thus, the conviction in this case will prevent her from working for any medical entity receiving federal funds, i.e., all hospitals, assisted living facilities and most doctors, for a minimum of five years.[40]

Finally, incarcerated, Ms. Cargile has lost her job and will therefore, be unable to pay her outstanding fines – all of which will ultimately result in warrants and perpetuate her poverty. These are all collateral consequences that the Court not only may consider but should consider in determining an appropriate sentence,[41] and lend further support for the defense

---

[37] *Gall,* 522 U.S. at 48-49 & n.4.
[38] *See* W.A.C. 246.16.840-.860
[39] 42 U.S.C. § 1320 a-7(a).
[40] *See* 42 U.S.C. § 1320 a-7(c)(3)(B).
[41] *See U.S. v. Scott,* 503 F. Supp. 2d 1097, 1103 (E.D.Wis. 2007) (in case of making false statement to obtain firearm where guidelines 6-12 months, court imposes 6 months home detention in part because "defendant also suffered significant collateral consequences in the probable loss of her MPS job, which added to the punitiveness of her conviction."); *U.S. v. Vigil,* 476 F. Supp. 2d 1231, 1316 (D.N.M. 2007) (finding variance appropriate where defendant in public corruption case was already collaterally punished by loss of his position, loss of his reputation, widespread media coverage of his case, and the emotional toll of two lengthy, public trials).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

recommendation for three months custody, followed by a reasonable term of location monitoring in lieu of continued incarceration.[42]

### B. Another three years of supervision best achieves legitimate goals of deterrence, protection of the community and rehabilitation

Sentencing goals of deterrence, incapacitation, and rehabilitation focus on what is necessary to make society safe.[43] A sentence of three months incarceration coupled with at least three months of location monitoring and federal supervision, is sufficient to ensure the safety of the community.

For one, Ms. Cargile voluntarily terminated from DREAM, making the deliberate and thoughtful decision that she required more accountability and treatment than the length of the program permitted. For another, it should be without question that Ms. Cargile has "learned her lesson" with respect to the underlying offense. True she committed a number of misdemeanor offenses over the course of her pretrial supervision, but the offenses were indicative of her poverty and disease, not incorrigibility. Even if this Court disagrees, Ms. Cargile was penalized for the offenses, both by having to address the behavior in DREAM and by the penalties imposed by the respective jurisdictions charged with prosecuting the offense(s). Moreover, she has never before spent more than a couple of weeks in jail, and faces more incarceration should she violate terms of supervision in the future. There is therefore, no reason to believe that another year in custody is necessary to achieve the goal of specific deterrence. Nor do any notions of general deterrence support a greater term of incarceration.

---

[42] The Sentencing Commission has recognized that "[p]robation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant." USSG 5B, Intro. Comment.

[43] *See, e.g., United States v. Cole,* 622 F. Supp. 2d 632 (N.D. Ohio 2008).

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

General deterrence remains a weak and controversial basis for imprisonment. There is no evidence that lengthier sentences reduce crime through general deterrence.  To the contrary, while the certainty of being caught and punished has a deterrent effect, studies uniformly show that there is no evidence that an increase in sentence length reduces crime. "Three National Academy Science panels, all appointed by Republican Presidents, reached that conclusion, as has every major survey of the evidence."[44]

That leaves rehabilitation. Rehabilitation is essentially geared towards changing "criminals" to law abiding citizens. Ms. Cargile has indeed struggled to maintain her sobriety. She has nevertheless shown by her actions in the five months prior to DREAM, before losing her children and her home, as well as during inpatient treatment and other moments throughout the course of supervision, that her mental health issues and behavior can be and will be addressed and adjusted with proper treatment and support. She has also made clear that she understands the Probation Department is a friend, not a foe that, with honesty, trust and hard work, will help her make better choices in the future and succeed.  Under these circumstances, jail will, no doubt, warehouse her but it does not further her rehabilitation.[45] Incarceration only interrupts the critical steps she has taken in treatment and negatively impacts her innocent children. For all these reasons, another year in prison is not necessary to deter Ms. Cargile or to protect the community.

/ / /

/ / /

---

[44] Michael Tonroy, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006). *See also* Zvi D. Gabby, *Exploring the Limits of Restorative Justice Pardigm: Restorative Justice and White Collar Crime,* 8 Cardoza J. Conflict Esol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be far better deterrent than its severity").

[45] 18 U.S.C. § 3582(a) ("The court . . . in determining whether to impose a term of imprisonment . . . shall consider the factors set forth in section 3553(a) to the extent they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.") (Emphasis added).

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### III.    Conclusion

The Supreme Court's decision in *Booker*, 543 U.S. 220 empowers the district court with great discretion to impose a sentence that vindicates all stated goals of sentencing.  Three months followed by another three years of federal supervision is not a proverbial "slap on the wrist" but rather a sufficient sentence, reflective of the offense of conviction; Ms. Cargile's history and characteristics, including the impact of her formative years and addictions giving rise to her mistakes; her sincere remorse for making the decisions that gave rise to these proceedings; her intent to make amends for her choices as evidenced by her voluntary termination from DREAM; the collateral impact on her innocent children; as well as the directive that a sentence be "sufficient, but not greater than necessary" to achieve legitimate goals of sentencing.

DATED this 26th day of September, 2017.

Respectfully submitted,

Jennifer E. Wellman
Assistant Federal Public Defender
Attorney for Amanda Cargile

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I certify that on September 26, 2017,  I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to Assistant U.S. Attorneys Erin Becker, Mark Parrent and Kerry Keefe, as well as U.S. Probation Officers Kelly Neumeister, Brian Facklam, Richard Cowan and Chief Probation Officer Connie Smith.

*/s/   Barbara Hughes*
Paralegal

DEFENDANT'S SENTENCING
MEMORANDUM
(*Amanda Cargile*; CR 15-206RAJ) - 21